**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: October 23 2015

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 14-33887 |
| | ) | |
| Peter H. Compton and | ) | Chapter 7 |
| Jessica D. Compton, | ) | |
| | ) | Adv. Pro. No. 15-3001 |
| Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| Greer Construction, LTD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Peter H. Compton, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff's "Complaint to Determine Dischargeability." Defendants are the debtors in the underlying Chapter 7 bankruptcy case. In its complaint, Plaintiff alleges that a debt is owed to it by Defendants that should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).[1]

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b)

---

[1] Plaintiff's complaint also alleges that the debt is nondischargeable under § 523(a)(4). At trial, Plaintiff proceeded only under § 523(a)(2)(A) and has thus waived any claim under § 523(a)(4).

as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment against Defendant Peter Compton declaring a debt owed to it by him in the amount of $31,773.08 to be nondischargeable under § 523(a)(2)(A). The court further finds that Defendant Jessica Compton is entitled to judgment in her favor on the complaint.

## FINDINGS OF FACT

This proceeding involves an agreement between Plaintiff Greer Construction Ltd. ("Greer Construction"), a general contractor, and Defendant Peter Compton ("Compton") relating to work completed on Defendants' home. Compton is the title owner of the home. [Pl. Ex. F]. Defendants experienced a water line break that resulted in significant water damage to their residence, the repairs for which were covered by Compton's homeowner's insurance.

Greer Construction was first contacted in January 2014 by a water remediation company to do certain demolition work at Defendants' home after the water damage had occurred. The demolition work was started in January and was completed by Greer Construction as a subcontractor for the water remediation company. Thereafter, Matt Humbles, who is a former insurance adjuster and is now employed by Greer Construction as an estimator, met with Defendants regarding the repair work to be done. Ongoing communications with Defendants regarding the work also occurred by telephone and email.

Humbles prepared an estimate for completion of the repair work, which he submitted to Compton's insurance company. On or about February 11, 2014, Humbles also prepared another estimate that included repairs as specifically requested by Defendants. [*See* Pl. Ex. B]. That estimate identifies Compton as Greer Construction's client. Compton testified that he and his wife, Defendant Jessica Compton, reviewed the estimates and discussed changes that they wanted. On February 20, 2014, Jessica Compton then emailed Humbles, with a copy to her husband, setting forth their "renovation ideas" that included numerous changes

2

from what was included in the estimate. [Pl. Ex. A, unnumbered p. 3]. She concluded her email by stating that "if our expectations are completely out of line with our insurance outlay, please let us know." [*Id.*]. Compton testified that changes were made and that the agreement was to rework the estimate to get it as close as possible to an amount approved by the insurance company. Humbles negotiated with the insurance company and, on April 15, 2014, Jessica Compton emailed him, with a copy to her husband, thanking Humbles "for working with the insurance company and obtaining approval on all of the work." [*Id.* at unnumbered p. 15]. According to Humbles, additional changes were made, and the amount that he negotiated with, and that was approved by, the insurance company was approximately $1,500 less than the total final estimate of $29,240.77 for all of the repairs and renovations of those parts of Defendants' home affected by the water damage ("Water Damage Project"). [*See* Pl. Ex. B, p. 34].

In response to an email from Humbles regarding "getting started" on the Water Damage Project, Compton stated on April 7, 2014, that he and his wife were in Barbados and that he would call Humbles when they returned to coordinate plans. [Pl. Ex. A, unnumbered p. 11]. Compton also stated in the email that he was "sure a check has arrived in the meantime," [*id.*], which he testified referred to a check from his homeowner's insurance company. Some materials had been purchased earlier in April, however, the repair and renovation work on Defendants' home did not begin until mid-April 2014. Defendants agree that the Water Damage Project was completed and they signed a Certificate of Completion on July 1, 2014. [Pl. Ex. C]. The Certificate of Completion was requested of them in an email from Humbles, wherein he explained that he needed it in order to send it to the insurance company so that the final insurance payment could be issued. [Pl. Ex. A, unnumbered p. 22]. He stated that he "wanted to get this moving in case it takes the insurance company a long time to move on this." [*Id.*]. On July 24, 2014, Compton forwarded to Humbles an email he had received from the insurance company stating that Compton would be receiving a check in the amount of $6,000 and that it needed additional information from Greer Construction before paying an invoice for the demolition work that totaled $2,713.75. [Pl. Ex. D].

In addition to the Water Damage Project, Defendants also made arrangements to have Greer Construction remodel a first floor bathroom that had not been affected by the water line break ("Bathroom Project"). The Bathroom Project was therefore not covered by Compton's homeowner's insurance. Nevertheless, Compton requested that Greer Construction complete the Bathroom Project after completion of the Water Damage Project, which it did in mid-July 2014 for the agreed price of $2,532.31. [*See* Pl. Ex. I, p.1]. Charles Plymale, sole shareholder and President of Greer Construction, testified, and there is no dispute, that all subcontractors for both the Water Damage Project and the Bathroom Project have been paid

3

in full.

There is no written agreement between the parties regarding payment arrangements for the work completed by Greer Construction, and there is conflicting testimony regarding such arrangements. Jessica Compton testified that she had a conversation in early March 2014 with Mark Plocek, an employee of Greer Construction in charge of finding subcontractors to do the work required and acting as project manager of that work. She testified that she discussed with Plocek the fact that the work they were having done was beyond what the insurance would cover and that Plocek told her that "folks like us will get on a payment plan." She testified that no further discussions regarding a payment plan ever occurred. Compton testified that he planned on entering into a payment plan and "figured we'd come to some agreement," testimony the court does not find credible under the circumstances, including the family's financial situation and spending habits at the time.

While Plocek recalls a discussion with Jessica Compton regarding additional work beyond that set forth in the original estimate, he testified that he did not tell her that she would be able to enter into a payment plan to pay for the work completed. He testified that he never discussed payment arrangements and had no authority to do so. Humbles testified that he had telephone conversations with Compton regarding payment and regarding the difference between the total amount of the project and the amount the insurance company agreed to pay and that the understanding was that Greer Construction was to be paid when the job was completed. According to Plymale, the majority of Greer Construction's work involves home repairs covered by a person's homeowner's insurance and only rarely has it allowed a customer to enter into a payment plan.

Having observed the witnesses, the court credits the testimony of Humbles and Plocek. The court does not believe that Plocek would ever have offered advice on payment arrangements for the work to be done. And it strains credulity to believe that Defendants actually believed that they could simply begin to make payments after the work was completed, especially given the fact that they never sought to ask what the terms of any payment plan would even be. That Defendants understood that payment was to be made on completion of the work and that Greer Construction expected the insurance proceeds to be available for such payment is supported not only by Humbles' testimony but also by Compton's testimony that the agreement was to get the estimate for the work to be done as close as possible to an amount approved by the insurance company and by the fact that Compton was receiving insurance proceeds that would cover the lion's share of the work. That understanding is also supported by emails between Humbles and Defendants, including emails sent by Jessica Compton and copied to her husband on February 20, 2014,

4

asking Humbles to let Defendants know if their repair expectations were out of line with their insurance outlay, on March 8, 2014, regarding a bathroom fan expense and asking "if money is getting tight, could we eliminate this expenditure," and on April 15, 2014, thanking Humbles for obtaining approval from the insurance company for the work to be done. [Pl. Ex. A, unnumbered pp. 3,10, 15]. Defendants' understanding is further supported by other email communications between Humbles and Defendants, including an email by Compton on April 7, 2014, referring to work being started on his return from Barbados and that he was sure a check was sent to him in the meantime. [*Id.* at unnumbered p. 11]. Jessica Compton's outlandish (and untrue) statement in her October 1, 2014, email to Humbles that "the insurance proceeds from the payout were in our account for so long that we had to use some of the funds and mesh them with our personal accounts" buttresses for the court the lack of credibility of her testimony about the supposed conversation with Plocek back in March 2014. [*Id.*, at unnumbered p. 29].

Compton has only two bank accounts– a savings account, which had a beginning balance of zero on February 4, 2014, and a checking account, both at Huntington Bank. Jessica Compton has no account in her name but has access to Compton's checking account by use of a debit card. There is no dispute that Compton received four checks from the insurance company in the amounts of $7,554.48, $5,000.00, $6,141.75, and $6,000.00.[2] Those checks were deposited in Compton's savings account in 2014 on February 4, February 14, April 10, and August 11, respectively, for total deposits of insurance proceeds of over $24,000.00. [*See* Pl. Ex. H, unnumbered pp. 1, 3, 14]. Thus, by mid-April 2014, Compton had deposited into his savings account insurance proceeds for the Water Damage Project totaling approximately $18,690.00. By April 14, 2014, $7,044.00 of those funds had been transferred to his checking account and another $1,311.00 had been used to make an internet mortgage payment, leaving a balance of approximately $10,330.00. [*Id.* at 1-4]. Notwithstanding the transfers from his savings account, by April 14, 2014, Compton's checking account balance was zero, resulting primarily from cash withdrawals and miscellaneous debit card purchases that included payment of expenses for Defendants' trip to Barbados. [*Id.* at 22-29].

By July 1, 2014, Compton's savings account, after multiple transfers to his checking account, had been depleted to only $52.97 and his checking account balance, after bi-weekly direct deposits of his employment checks and multiple "checking reserve transfers" due to overdrafts, was only $1,173.52. [*Id.*

---

[2] Plaintiff alleges in paragraph 7 of its complaint that Defendants received four checks from Compton's homeowner's insurance carrier and the amounts of those checks as set forth above. [Doc. # 1, ¶ 7]. At trial, Defendants' counsel stated that Defendants have no dispute as to the receipt and the amounts of the four checks as alleged in Plaintiff's complaint.

at 14, 65]. According to Jessica Compton, Defendants were living from paycheck to paycheck during 2014. Extensive debit card expenses during the months of May through August include, among other things, expenses relating to trips to the Gaylord Opryland in Tennessee, to Kentucky and to Mexico. [*See* Pl. Ex. A, unnumbered pp. 49-50, 61-62]. Compton testified that he had no funds on deposit elsewhere and understood that the insurance proceeds were intended for "whatever I chose to use them for."

Humbles was aware of the fact that the insurance company had sent checks to Compton during the course of the Water Damage Project. He testified that Greer Construction's customers typically receive the insurance payments, and that Greer Construction does not invoice the customer until the work is completed. On July 16, 2014, on completion of both the Water Damage Project and the Bathroom Project, Greer Construction sent Compton three invoices in the amounts of $2,532.31 for the Bathroom Project, $29,240.77 for the Water Damage Project and $2,713.75 for the demolition work, for a total amount due of $34,486.83. [Pl. Ex. I]. Compton testified that he received the invoices after the work was completed. There is no dispute that Defendants have paid nothing on the amount due to Greer Construction.

Over two months later, on October 1, 2014, Jessica Compton sent Humbles an email stating that Defendants were "in agreement with the expenses and details of the work performed" and that "[w]hat we would like to do is make monthly payments to you." [Pl. Ex. A, unnumbered p. 29]. This wording and the delayed timing of the response after calls and messages from Plaintiff about payment is not reflective of a mental state suggesting that was in fact the parties' agreement as to how payment would be handled. Her email suggested a payment plan and, as already indicated, stated that "[t]he insurance proceeds from the payout were in our account for so long that we had to use some of the funds and mesh them with our personal accounts." [*Id.*]. Greer Construction rejected the proposed payment plan.

On October 24, 2014, Defendants filed a petition for relief under Chapter 7 of the Bankruptcy Code. [*See* Pl. Ex. G]. Their Schedule I shows Compton's monthly income after payroll deductions as an emergency physician assistant to be $6,189.15. Although Jessica Compton is an attorney, she is on inactive status and was working for a short time at the Wood County Humane Society. Schedule I shows her monthly income after payroll deductions from that employment to be $145.37. Defendants' Schedules I and J show that their net monthly income after expenses is $7.26. Defendants' Schedule B shows that their only financial accounts are Compton's Huntington Bank checking and savings accounts with balances on the date of filing of zero and $200, respectively.

## LAW AND ANALYSIS

**I. 11 U.S.C. § 523(a)(2)(A)**

Plaintiff seeks a determination that Defendants owe it a debt in connection with the work completed at their home that is nondischargeable under 11 U.S.C. § 523(a)(2)(A). A creditor must prove exceptions to dischargeability for individual debts under § 523(a), including the exception for fraud, by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291(1991).

Section 523(a)(2)(A) excepts from discharge a debt " for money, property, [or] services,. . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." 11 U.S.C. § 523(a)(2)(A). "'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)(quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)). In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 280-81 (6th Cir. 1998). A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Id.* at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999).

Before nondischargeability is determined, however, Plaintiff must first prove that a debt is owed to it by Defendants. Defendants do not dispute that Plaintiff is owed a total of $34,386.83. The question is by whom. Compton is the sole owner of the property where the repairs and remodeling that are the basis for the debt owed were completed. The estimate was submitted to Compton and states that he is Greer Construction's client. Although Compton consulted with his wife regarding the repairs, and she interfaced with Greer Construction employees, there is no evidence that she was a party to the contract for the repairs. While Greer Construction has met its burden of proving that the debt is owed by Compton, it has not met its burden with respect to Jessica Compton. Accordingly, Jessica Compton is entitled to judgment on the

7

complaint in her favor and the court will address Greer Construction's claim as to Compton only.

The debt at issue consists of the costs of three separate projects – the Water Damage Project, the Bathroom Project and the demolition work. The court addresses each separately in analyzing Plaintiff's § 523(a)(2)(A) claim.

**A. Water Damage Project**

As discussed earlier, the court finds that Compton understood that Greer Construction expected the insurance proceeds to be available for payment of the cost of completing the Water Damage Project and that payment was to be made on completion of the work. Compton allowed Greer to negotiate on his behalf with the insurance company using the expertise of Humbles. Defendants' concerns with aligning project costs with what the insurance company would pay were communicated to Greer Construction. Significantly, while Compton was in Barbados he communicated to Humbles by email linking the receipt of partial insurance proceeds to the start of Greer Construction's work on the project. That Compton contemporaneously understood that Greer Construction expected to be paid in full using the insurance proceeds when the project was done was emphasized as recently as Compton's July 24, 2015, e-mail to Humbles forwarding the insurance company's request for more information in connection with the $6,000 check. [Ex. D].

By mid-April, Compton had received over $18,000 of the insurance proceeds and had already spent over $8,000 of those funds. He nevertheless allowed Greer Construction to begin and continue work on the Water Damage Project. Without raising or agreeing upon any other payment arrangement, he continued to dissipate the insurance proceeds, or allow them to be dissipated, in order to fund, among other things, extensive debit card expenses, including expenses for trips to the Gaylord Opryland in Tennessee, to Kentucky, and to Mexico. By July 1, 2014, when the Water Damage Project was completed, Compton had depleted his bank accounts to only approximately $1,300. There is no evidence, and no suggestion in Compton's bank account statements, of any extenuating circumstances that may have required payment of some unanticipated expense during the relevant time period.

The court finds that Compton had no intention from the commencement of the work upon his return from Barbados to pay in the manner understood by the parties to be required, *i.e.* payment in full on completion of the work, which although no written agreement to that effect exists, the court finds was the agreement. While a mere breach of a promise to pay will not support a finding of fraud, "any debtor who does not intend to perform a contract from its inception has knowingly made a false representation." *Stifter v. Orsine (In re Orsine),* 254 B.R. 184, 188 (Bankr. N.D. Ohio 2000). Compton intentionally misled Greer Construction into doing the work by fostering the false impression that the insurance proceeds would be

8

used for payment on completion of the Water Damage Project and then omitting to tell Greer Construction as Defendants dissipated them. Indeed Compton immediately began dissipating the insurance proceeds with no other way to pay the debt as shown by Defendants' financial circumstances.

The fact that, on completion of the work, Compton offered to enter into a payment plan that had not been agreed to by Greer Construction does not change the court's conclusion. The agreement, either express or implied, was that Greer Construction would be paid on completion of the job, not over time. That Greer Construction relied upon the fact that it would be paid on completion of the job is further evidenced by the fact that it immediately rejected Compton's offer to pay over time and Plymale's testimony that it rarely entered into payment plans.

The court further finds that Greer Construction's reliance was justified, given Greer Construction's first hand knowledge that Compton was receiving insurance proceeds that would cover most of the cost of the job, and that its reliance was the proximate cause of Greer Construction's $29,240.77 loss in completing the Water Damage Project. Had Compton properly told Humbles that he was going to pay for the work over time, not when completed, and did not intend to use the insurance proceeds to do so, the court finds that Greer Construction would not have commenced work on and then continued to completion the Water Damage Project. Accordingly, the $29,240.77 debt owed by Compton for the Water Damage Project is nondischargeable under § 523(a)(2)A).

B. Bathroom Project

Although the cost of the Bathroom Project was not covered by Compton's homeowner's insurance, the court also finds that he misrepresented his ability to pay for that project in the manner understood by the parties to be required. The Bathroom Project was started on or about July 1, 2014, when Compton's bank accounts were depleted to approximately $1,300. According to Jessica Compton, Defendants were living from pay check to pay check, which is consistent with Defendant's bankruptcy schedules less than four months later showing only $200 in Compton's bank accounts and monthly income after expenses of only $7.26, notwithstanding Compton's substantial income as an emergency physician assistant. Allowing Greer Construction to proceed with the Bathroom Project impliedly represented an ability to pay for the work on its completion. Such a representation was, at a minimum, made with gross recklessness as to its truth in light of Defendants' financial circumstances and spending habits, as shown by their testimony and the Huntington Bank statements, at the time. Compton's vague and lacking references to other "credit resources" do not persuade the court otherwise. Given Compton's failure to discuss and get approval from Greer Construction for paying for the project over time, the court finds that his misrepresentation was made

9

with the intent to deceive Greer Construction regarding payment otherwise reasonably expected upon completion of the project.

And for the reasons discussed above, the court finds that Greer Construction justifiably relied upon Compton's misrepresentation. When it commenced the Bathroom Project, Greer Construction had not yet been burned by Compton's failure to pay for the Water Damage Project and the realization that the insurance proceeds had been dissipated. Its reliance was the proximate cause of its loss, namely, the $2,532.31 cost of services and materials in completing the Bathroom Project, which the court finds would not have been undertaken had Compton told them he would pay for it later over time. Accordingly, the $2,532.31 debt owed by Compton for the Bathroom Project is nondischargeable under § 523(a)(2)A).

### C. Demolition Work

Unlike the work performed with respect to the Water Damage Project and the Bathroom Project, Greer Construction performed the initial demolition work as a subcontractor for a water remediation company. It was contacted by the water remediation company to do the work, not Defendants. There is no testimony or evidence indicating how Greer Construction was to be paid or that there were ever any discussions between Greer Construction and Defendants regarding the cost of the demolition work or payment for such work either before the work was begun or after it was completed. To the extent that Greer Construction relied upon payment by Compton when he received the proceeds from his homeowner's insurance rather than payment by the water remediation company that engaged its services, there is no evidence of any misrepresentation by Compton regarding such payment that would justify such reliance. Greer Construction has not met its burden of proving that the $2,713.75 debt for the demolition work is nondischargeable under § 523(a)(2)(A).

## II. Attorney's Fees

Plaintiff also argues that it is entitled to an award of attorney's fees in this case. Generally, under the "American Rule," which applies to litigation in the bankruptcy courts, a prevailing litigant may not collect attorney's fees from his opponent unless authorized by federal statute or an enforceable contract between the parties. *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997). There must therefore be a statute, a contract or other specific rule of common law authorizing an award of attorney's fees. *See Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 448-49 (2007). The court does not find any legal or factual basis for an award of attorney's fees to Plaintiff.

There is no basis in the Bankruptcy Code for an award of attorney's fees to a creditor successfully prosecuting a § 523(a)(2)(A) claim. *Cf.* 11 U.S.C. § 523(d)(debtors shall be awarded attorney's fees in

certain circumstances not present here).  Nothing in § 523(a)(2)(A) indicates that Congress intended the prevailing party to be awarded fees.

Under Ohio law, plaintiffs who successfully prove fraud are entitled to an award of attorney's fees as an element of compensatory damages under certain circumstances.  *See Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 558 (1994).  But this entitlement is not automatic.  The Ohio Supreme Court has clearly stated that attorney's fees are only appropriately awarded on a fraud claim where punitive damages are warranted.  *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 35 (2000) (agreeing that the appropriateness of awarding attorney's fees is dependent upon the propriety of the award for punitive damages and finding that "[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted."); *Zoppo*, 71 Ohio St. 3d at 558.  The record must support a finding that the legal standard for punitive damages has been met.  That standard requires a finding that the fraud has been gross or malicious.  *Logsdon v. Graham Ford Co.*, 54 Ohio St. 2d 336, 339-40 (1978); *Bennice v. Bennice*, 82 Ohio App. 3d 594, 599 (1992).

Although an element of compensatory damages, Plaintiff offered no evidence at trial regarding attorney's fees.  *See* Fed. R. Civ. P. 54(d)(2)(A) (providing that a claim for attorney fees be made by motion *"unless the substantive law requires those fees to be proved at trial as an element of damages"*); Fed. R. Bankr. P. 7054(b)(2)(A).  And Plaintiff has not sought punitive damages.  In any event, the court finds that the evidence does not establish the sort of gross fraud or malice on Compton's part necessary to justify an award of punitive damages, and thus attorney's fees, beyond his basic liability for fraudulent misrepresentation.

## **CONCLUSION**

Greer Construction having failed to meet its burden under § 523(a)(2)(A) as to the $2,713.75 owed by Compton for the demolition work, but having met its burden of proof by a preponderance of the evidence as to the $29,240.77 owed for the Water Damage Project and the $2,532.31 owed for the Bathroom Project, it is entitled to judgment in its favor and against Defendant Peter H. Compton in the amount of $31,773.08 and to a declaration that this debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A).  However, Greer Construction has failed to meet its burden of proof with respect to its claim against Defendant Jessica D. Compton, and she is entitled to judgment on the complaint in her favor.  A separate judgment in accordance with this Memorandum of Decision will be entered by the court.

###